CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 2 6 2019

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

TORREY LAVELL WASHINGTON, )  **CASE NO. 7:16-CV-00476**
  Plaintiff,      )
           )
v.           )
           )
TERRY MCAULIFFE, et al.,  )  **By: Hon. Michael F. Urbanski**
  Defendants.    )  **Chief United States District Judge**

## MEMORANDUM ORDER

Torrey Lavell Washington, currently incarcerated at the Wallens Ridge State Prison (WRSP), claims that his rights under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1, et seq., (RLUIPA), the Free Exercise Clause, the Equal Protection Clause, the Cruel and Unusual Punishment Clause, the Virginia Constitution, and Virginia statutes are being violated in various ways by the defendants. ECF No. 25-1. This court previously entered summary judgment dismissing a number of Washington's claims and found that all the defendants except Natarcha Gregg were entitled to qualified immunity to the extent they were sued in their individual capacities. The court directed the state defendants[1] to file a supplemental motion for summary judgment on the remaining claims against Gregg and on Washington's claims for injunctive relief. ECF No. 78.

Pending is the supplemental motion for summary judgment brought by the remaining state defendants to which Washington has responded. For the reasons discussed more fully

---

[1] The court identified the defendants who were associated with Virginia as the "state defendants" and those who worked for the Keefe Commissary Network, LLC, as the "Keefe defendants."

below, the court **GRANTS** the defendants' supplemental motion for summary judgment and **DISMISSES** Washington's causes of action.

## BACKGROUND

Washington practices the Rastafarian religion and one tenet of the religion is that adherents let their hair grow long and wear it in dreadlocks. When Washington arrived at the Nottaway Correctional Center of the Virginia Department of Corrections (VDOC) on June 3, 2014, he was forced to cut his hair and was placed in segregation. When he later was transferred to the WRSP on April 5, 2016, he was placed in a special unit for offenders who refuse to cut their hair, known as the Grooming Standards Violator Housing Unit (VHU).

Initially when Washington was placed in the VHU, he was in "Phase I." Because of his classification, he was not allowed to have a personal television, could not order or receive a quarterly Securepak,[2] could not buy the maximum at the commissary, and did not get five hours of pod recreation. He could only watch television in the common area and the television was set to play only one Christian channel.

Washington stayed in Phase I on the VHU for two years and 10 months[3] but has since been allowed to participate at the Phase II level. He now is able to receive all of his "fundamental privileges." ECF No. 88 at 9. He worked as a pod recreation worker from April 13, 2017 to July 23, 2017 and has worked as a houseman since that time. However, without cutting his hair he is not allowed to have a job working in the kitchen or to enroll in a trade.

---

[2] The Securepak program permits offenders to order on a quarterly basis food items that are not available on the regular commissary list. An offender may spend up to $125 per order. Affidavit of J. Collins, ECF No. 84-1 at ¶ 7.
[3] Although Washington states that he stayed in Phase I for two years and ten months, records indicate that he was moved to Phase II after approximately one year and two months. Encls. B to Collins Aff., ECF No. 84-1 at 13-15.

Another tenet of the Rastafarian religion is that its adherents are vegetarians and do not eat eggs. Washington sometimes is served eggs alone or incorporated into other food. At one point, VDOC had a special Rastafarian meal plan that has since been discontinued, while no other religious based meal plan has been discontinued. In addition, in the VHU, the same food trays left over at lunch are often served for dinner and the food is not properly stored between the meals, creating a risk for food-borne illnesses. Also, the WRSP kitchen staff serve inadequate portions as a way to punish inmates in the VHU for not complying with grooming standards.

In its previous memorandum opinion, the court dismissed Washington's claims based on his being forced to cut his hair after finding they were time-barred and unexhausted. The court also dismissed Washington's claims against the Keefe defendants--Joey O'Quinn, Everleane Randolph, and Regina Sturgill Witt--for failure to state a claim. In addition, the court entered summary judgment in favor of the following state defendants based on qualified immunity to the extent they were sued in their individual capacities: Terry McAuliffe, Brian Moran, Harold W. Clarke, A. David Robinson, S. Stallard, M. Broyles, Stout, Belcher, Evans, B.J. Ravizee, Ferris, J. Collins, C. King, Anderson, S. Collins, D. Cooke, D. Byington, C. Rutherford, C.A. Caudill, Carmony, Leslie J. Fleming, J.C. Combs, Robert H. Bivens, and Marcus Elam. In addition, the court further found that all the state defendants were entitled to summary judgment as to damages sought based on Washington's RLUIPA claims.

The following claims remain: (1) Washington's claim against defendant Natarcha Gregg in her individual capacity alleging that her failure to provide an egg substitute violates his rights under RLUIPA, the Free Exercise Clause, the Equal Protection Clause, and the Cruel and

Unusual Punishment Clause; (2) Washington's request for injunctive relief asking that defendants Gregg and S. Stallard be ordered to authorize an egg substitute, to serve adequate quantities of food, and to forbid serving old, cold food; (3) Washington's claim for injunctive relief seeking to have defendants Clarke and Robinson modify the grooming policy set out in Operating Procedure (OP) 864.1 because it violates his religious freedom rights and discriminates against him as a black male; and (4) Washington's claim that Defendants Fleming, Combs, J. Collins, Anderson, and King should be ordered to restore Washington's fundamental privileges. ECF No. 78 at 14-16; 19-20.

## APPLICABLE LAW

### I. Summary Judgment Standard

Pursuant to Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has

been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255. The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). The non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (quoting Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990)). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn

5

from" those facts. <u>World-Wide Rights Ltd. P'ship v. Combe Inc.</u>, 955 F.2d 242, 244 (4th Cir. 1992).

## II. RLUIPA

With regard to prison inmates, RLUIPA provides the following:

(a) General rule

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(1) is in furtherance of a compelling government interest; and

(2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1 (a). RLUIPA claims are analyzed under the strict scrutiny standard and are to be construed "'in favor of broad protection of religious exercise.'" <u>Lovelace v. Lee</u>, 472 F.3d 174, 186 (2006) (quoting 42 U.S.C. § 2000cc-3(g)). The inmate bears the initial burden of showing that a prison's policy creates a substantial burden on his religious exercise. If he makes such a showing, the burden shifts to the defendant to show that its policy furthers a compelling state interest by the least restrictive means. 42 U.S.C. § 2000cc-2 (b); <u>Incumaa v. Stirling</u>, 791 F.3d 517, 525 (4th Cir. 2015).

Although the statute does not define "substantial burden," the Supreme Court has defined the term in the context of the Free Exercise Clause as "putting substantial pressure on an adherent to modify his behavior and violate his beliefs," <u>Thomas v. Review Bd. Of Ind. Employment Sec. Div.</u>, 459 U.S. 707, 718 (1981), or "one that forces a person to 'choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand.'"

Lovelace, 472 F.3d at 187 (quoting Sherbert v. Verner, 374 U.S. 398l, 404 (1963)). Government action does not create a substantial burden if it makes the religious exercise more expensive or difficult, as long as it does not pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his religion. Al-Azim v. Everett, No. 3:14CV339, 2017 WL 1097219 at * 3 (E.D. Va. 2017) (citing Living Water Church of God v. Charger Twp. Of Meridian, 258 Fed. Appx. 729, 739 (6th Cir. 2007)).

### III. First Amendment

Inmates retain protections provided by the First Amendment, including its directive that no law shall prohibit the free exercise of religion. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). Nevertheless, inmates' rights are evaluated in the context of their incarceration and courts accord deference to prison officials. Lovelace, 472 F.3d at 199. In the context of prison regulations, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if 'prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations.'" Turner v. Safley, 482 U.S. 78, 89 (1987) (quoting Jones v. North Carolina Prisoners' Union, 433 U.S. 119, 128 (1977)). Thus, the First Amendment affords less protections to inmates' free exercise rights than does RLUIPA. Lovelace, 472 F.3d at 199-200.

### IV. Equal Protection

The Equal Protection Clause of the Fourteenth Amendment requires that persons who are similarly situated be treated alike by the government. City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439-41 (1985). To establish a violation of the Equal Protection Clause,

a plaintiff must show that he has been treated differently from others who are similarly situated and that the unequal treatment was intentional or purposeful. If a plaintiff makes such a showing, the court then determines whether the disparity in treatment can be justified under the requisite level of scrutiny. Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001).

## V. Cruel and Unusual Punishment

The Eighth Amendment protects convicted inmates from cruel and unusual living conditions. Rhodes v. Chapman, 452 U.S. 337, 345-346 (1991). The Constitution does not mandate comfortable prisons, but neither does it allow inhumane ones. Id.; Helling v. McKinney, 509 U.S. 25, 31 (1993). Prison officials must provide humane conditions of confinement, including adequate food, clothing, shelter, and medical care, and also must take reasonable measures to ensure the safety of inmates. Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citing Hudson v. Palmer, 468 U.S. 517, 526-527 (1984)). "To make out a prima facie case that prison conditions violate the Eighth Amendment, a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (internal quotations and citations omitted). "[I]n order to withstand summary judgment on an Eighth Amendment challenge to prison conditions[,] a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." Id. at 1381.

## DISCUSSION

## I. Failure to Provide an Egg Substitute

Washington claims that the failure to provide an egg substitute results in his being provided inadequate calories and nutrition because eggs are served separately and as ingredients in many meals served at VDOC. He claims that VDOC, where Gregg serves as the dietician, provides a pork substitute for Muslims and Jews whose religion prohibits eating pork, but does not provide an egg substitute for Rastafarians whose religion prohibits eating eggs. He also asserts that at one point, VDOC offered a special Rastafarian menu, which has since been discontinued, but that VDOC has never discontinued any other meal designed to accommodate religious beliefs. He also claims that members of the VHU are given inadequate portions of food as well as old and cold food in an effort to force them to cut their hair. Thus, he asserts that the failure to provide an egg substitute violates his rights under the RLUIPA and the First Amendment and also his right to Equal Protection under the Constitution. He also appears to make a claim under the Eighth Amendment based on the portions and quality of the food served.

### A. RLUIPA and First Amendment Claims

Defendant Gregg submitted a supplemental affidavit in which she stated that Washington is receiving the Common Fare diet at WRSP, which is a religious diet for inmates whose religious dietary needs cannot be met by the Master Menu. The Common Fare diet yields a daily caloric value of 2600-2700 calories, 105-110 grams of protein, and has been certified to meet or exceed minimum daily nutritional requirements. While the Common Fare diet contains a meat substitute, such as beans or a soy patty, it does not offer an egg substitute.

9

Only offenders who are allergic to eggs are offered egg substitutes. Affidavit of Natarcha Gregg, ECF No. 84-2 at ¶¶ 8-9.

One egg has approximately 70 calories[4] and 6 grams of protein. The Common Fare diet serves eggs six days per week with an average of 3.1 eggs per day, for an average of 217 calories and 18.6 grams of protein. It provides an average of 2,653 calories per day with eggs and 2,464 calories without eggs. If an offender does not eat the eggs on the tray, he will, on average, consume 189 fewer calories and 18.6 fewer grams of protein per day. Id. at ¶ 10.

As an alternative, an inmate may choose to eat the vegetarian meal from the Master Menu, on which two eggs are offered at breakfast three times per week. The vegetarian option for the Master Menu substitutes peanut butter and beans for meat. The vegetarian menu totals 3,534 daily calories, which is 881 calories more than the Common Fare menu as it is written. An offender who does not eat the eggs on the vegetarian menu would consume 420 fewer calories per week, or 60 fewer calories per day, on average, and 36 fewer grams of protein per week, or 5.1 fewer per day, than if he ate the regular vegetarian menu. Id. at ¶ 12. Inmates also may purchase food from the commissary. Id. at ¶ 9.

Under RLUIPA, in order to show that the failure to provide an egg substitute creates a substantial burden on his ability to exercise his religion, Washington must show that it puts substantial pressure on him to modify his behavior and violate his beliefs. Alternatively, he must show that the lack of egg substitute forces him to choose between following his religion and not eating the eggs, or abandoning the teachings and eating the eggs.

---

[4] Gregg states in her affidavit that an egg provides 77 calories per day, but the calorie totals at which she arrives coincide with an egg having 70 calories. The difference is neither significant nor material to Washington's claims.

First, it is clear that Washington is not forced to eat any eggs offered and two district courts in Virginia have held that a prison does not substantially burden an inmate's religious exercise if it serves him things that his religion does not allow. See Acoolla v. Angelone, No. 7:01-cv-01008, 2006 WL 2548207 at *8 (W.D. Va. 2006) (finding that just because a prison serves items prohibited by inmate's religion does not mean that the prison is forcing him to eat them because he can discard them) and Shabazz v. Johnson, No. 3:12-cv-282, 2015 WL 4068590 at *10 (E.D. Va. 2015) (Common Fare diet, although it included fish, did not impose substantial burden on inmate whose religion dictated he be vegetarian because he was not forced to eat the fish). Accordingly, Washington cannot show a violation of RLUIPA based on his being served eggs at the prison.

Washington alleges that without the egg substitute, the meals are nutritionally inadequate, and that he is forced to choose between consuming the eggs and violating this tenet of his religion, or foregoing the eggs and compromising his nutritional intake. However, Washington can obtain sufficient calories from either the Common Fare menu or the vegetarian meal from the Master Menu. If he chooses the Common Fare menu, he will consume at least 2,464 calories daily and 86-95 grams of protein even if he discards the eggs. On the vegetarian version of the Master Menu, he can discard the eggs that are served three mornings per week and still consume 3,114 calories, and 93-98 grams of protein on those days. Gregg Aff., ECF No. 84-2 at ¶ 12 and pp. 15-18. Washington also is free to supplement his diet with additional food, including peanut butter and other protein sources, from the commissary. Encls. A to Gregg Aff., ECF No. 84-2 at 10.

11

Based on the summary judgment record, Washington has failed to show that WRSP's decision to not provide an egg substitute at meals burdens the exercise of his religion under RLUIPA. As such, the court does not find it necessary to assess the issue of whether the decision to not provide an egg substitute was made in furtherance of a compelling government interest and is the least restrictive means of furthering that compelling government interest.

Washington also claims that the lack of an egg substitute violates his First Amendment right to practice his religion. Because Washington failed to show that his ability to exercise his religion was substantially burdened under RLUIPA, he similarly has failed to show it under the First Amendment. Therefore, the court grants summary judgment to defendant Gregg on Washington's RLUIPA and First Amendment claims based on the failure to supply an egg substitute.

### B. Equal Protection Claim

Washington also claims that at one time VDOC offered a Rastafarian diet, but has discontinued it, while still allowing other "religious meals." He argues that the failure to provide a Rastafarian diet violates his rights under the Equal Protection clause. Defendant Gregg stated in her affidavit that she had never known VDOC to have a Rastafarian diet. She also stated that there was not a non-pork menu for Jewish and Muslim prisoners, although a vegetarian option is available at each meal. Most of the Muslim and Jewish inmates who observe dietary restrictions for religious reasons eat the Common Fare menu. Gregg Aff., ECF No. 84-2 at ¶ 11.

Apparently, in the mid-eighties, at least two prisons in Virginia, the Nottoway Correctional Center and the Bland Correctional Center, provided a vegan diet for Rastafarian

inmates. Acoolla, 2006 WL 2548207 at *3 and n. 4. In 1990 or 1991, what had been the vegan Rastafarian diet was discontinued and became a vegetarian diet. Id. at *3. Washington cannot make out an equal protection claim on these facts because at this time there is no specific religion-based diet for any group and either the Common Fare or vegetarian options in the Master Menu are available to accommodate inmates who do not eat meat for religious reasons.

Also, while egg substitutes are available to those inmates who are allergic to eggs, those inmates are not similarly situated to Washington or other Rastafarians. In the equal protection context, "similarly situated" means that the individuals "are in all relevant aspects alike." Stevens v. Holder, 966 F.Supp.2d 622, 641 ( E.D. Va. 2013) (citing Veney v. Wyche, 293 F.3d 726, 730-731 (4th Cir. 2002)). Inmates who are allergic to eggs may become ill if they eat them, while those who refrain from eating eggs because of their religious beliefs will not. Thus, they are not alike in all relevant aspects for purposes of an equal protection claim.

Washington has not provided evidence to show that there is a material fact issue on his claim that failure to provide an egg substitute rises to the level of an equal protection violation. Accordingly, summary judgment is entered for defendant Gregg on this issue.

## II. Inadequate and Poorly Stored Food

Washington also asserts that inmates in the VHU are often served the same exact trays at dinner that they were served at lunch and that the trays sit in the food cart for hours, which makes the food "inedible" and increases the possibility that a prisoner will contract a food-borne illness. He claims that people in the general population are served different trays than those in the VHU. Washington additionally asserts that inmates are not given adequate portions of food in the VHU to induce them to comply with grooming standards. In an

13

affidavit filed with his response to an earlier motion for summary judgment, Washington stated that out of twenty-one trays served during the week, only seven will have adequate portions. ECF No. 58-2 at 2-3.

"It is well established that inmates must be provided nutritionally adequate food, 'prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.'" Shrader v. White, 761 F.2d 975, 986 (4th Cir. 1985) (quoting Ramos v. Lamm, 639 F.2d 559, 571 (10th Cir. 1980)). Failure to provide an adequate diet could rise to the level of cruel and unusual conditions of confinement if it amounted to a serious deprivation of a basic human need. Cf. Rhodes, 452 U.S. at 347.

As discussed above, Gregg submitted evidence in the form of her affidavit that both the Master Menu and the Common Fare menu provide an adequate number of calories and nutrients for inmates. Washington claims that the portion sizes he is served are inadequate, but he gives no details about the relative size of the portions he receives. Nor has he alleged that he has lost weight while at WRSP or suffered any other sign of malnutrition. See King v. Lewis, 358 Fed. Appx. 459, 460 (4th Cir. 2009) (finding prisoner stated claim when he alleged that vegetables served added up to less than two teaspoonfuls and eggs were even less, meat served was less than two ounces, and most meals would not add up to six ounces total) and Escalante v. Huffman, No. 7:10cv00211, 2011 WL 3107751 at *9 (W.D. Va. 2011) (finding that inmate stated an Eighth Amendment claim for inadequate food when he alleged weight loss of thirty-four pounds over a year and dizzy spells when exercising). Accordingly, Washington has failed to produce summary judgment evidence to create a fact issue on his allegation that inmates in the VHU receive inadequate portions of food.

Washington also has not alleged that he or any other inmate has suffered from a food-borne illness from food not being properly stored. To the extent his claim that the food is "inedible" is based on its taste, texture, or temperature, he similarly has not stated a claim under the Eighth Amendment. See Harrison v. Moteka/Motycka, No. 9:06-1203-PMD-GCK, 2006 WL 4071598 at *6 (D.S.C. 2006) (collecting cases and noting that while prisoners have a right to adequate food, they do not have a right to food that is tasty or even appetizing).

Washington has not provided evidence to overcome Gregg's affidavit stating that inmates in the VHU are served according to the standardized menus and are provided adequate and nutritious food. Accordingly, summary judgment is entered for Gregg on this issue.

### III. Claims for Equitable Relief

#### A. Food-Related Claims

Washington asks that defendants Gregg and Stallard, director of food services at WRSP, be ordered to serve an egg substitute, authorize appropriate quantities of food, and forbid, old, cold food to be served. As discussed above, failure to provide an egg substitute does not amount to a violation of Washington's constitutional or statutory rights and thus, under the circumstances presented in this case, there is no basis for ordering defendants to provide an egg substitute to Washington. Similarly, there is no constitutional basis on which to order defendants to provide hot, tasty food, as long as the food is safe to eat and nutritionally adequate. Finally, because defendants already are required under the Constitution to provide an adequate amount of nutritious food and Washington has not shown that they have failed to do so, the court declines to issue injunctive relief to that effect.

15

## B. Modification of OP 864.1[5]

Operating Procedure 864.1, the current version of which became effective August 1, 2016, was written to establish uniform personal grooming standards for offenders in VDOC and provides for a VHU to manage and encourage compliance for male offenders. Washington asserts that OP 864.1 should be modified because it forces him to cut his hair in violation of his religious beliefs and discriminates against him as a black male.

### (1) The Grooming Policy

OP 864.1 provides that hair styles and beards that could conceal contraband; promote identification with gangs; create a health, hygiene, or sanitation hazard; or significantly compromise the ability to identify an offender, are not allowed. Male offenders must keep their hair neatly cut, no longer than above the shirt collar and around the ears; cannot have hair more than one inch in thickness or depth, are not allowed to wear braids, plaits, dreadlocks, cornrows, ponytails, buns, mohawks, partially shaved heads, designs cut into hair, or any style that could conceal contraband. Female offenders' hair must be neat and no longer than shoulder length. They may wear one or two ponytails, or multiple neat, tight, braids. They are not allowed to wear mohawks, tailed haircuts, shaved or partially shaved heads, more than two ponytails, dreadlocks, designs cut into the hair, or any style that could conceal contraband.

On the day of initial intake, offenders are given an order to comply with the grooming standards and will receive a haircut and shave if needed to comply. If an offender refuses to

---

[5] A copy of OP 864.1 is attached as Enclosure A to the affidavit of A. David Robinson, ECF No. 84-3 at 7-13. Washington also referred to OP 864.2 in his pleadings, but OP 864.2 was never signed or put into effect. It appears that OP 864.2, which addressed the VHU, was incorporated into OP 864.1. See Robinson Aff., D.E. 84-3 at ¶ 12.

16

comply with the order on religious principles, the offender will be charged with Offense Code 133, "Refusal to obey an order to comply with the department's grooming standards," and placed in pre-hearing or general detention, depending on the institution. The offender will then be managed as any other offender who refuses to comply with VDOC offender grooming standards.

If an offender in an institution refuses to cooperate other than on religious principles, the use of reasonable force or restraints is authorized to the extent needed to bring the offender into compliance with grooming standards. In a Community Corrections facility, an offender that refuses to cooperate may be subject to removal from the program and offenders who are scheduled to transfer to a lower security level facility but who are not in compliance with the grooming standards will have the transfer cancelled. All offenders who refuse to comply with VDOC grooming standards will remain in segregation or restrictive housing status until the offender is in compliance with the grooming standards or is housed in the VHU. With regard to the need to be in compliance with grooming standards for placement in a Community Corrections facility or transfer to a lower security level facility, OP 864.1 does not distinguish between inmates who refuse to comply based on religious beliefs and those who simply refuse to comply.

### (2) Establishment of the Grooming Standards Violator Housing at Wallens Ridge State Prison

The VDOC established the VHU at WRSP to "manage and encourage compliance of male offenders determined to be in violation of [VDOC] grooming standards." OP 864.1 V.A., ECF No. 84-3 at 10. The VHU addresses noncompliance by giving grooming standards violators an opportunity to gain privileges through participation in programs while reducing

17

the use of segregation and restrictive housing in institutions. To be housed in the VHU, an inmate must have been convicted of refusing to comply with grooming standards and have no past history of disruptive or assaultive behavior.

The VHU uses two pods at WRSP with one pod housing Phase I offenders and another pod housing Phase II offenders. Phase I offenders have fewer privileges than Phase II offenders. Phase I offenders may watch a television mounted on the wall in the unit with a volume box that allows individual headset control inside and outside of the cell. The television is considered a privileged item and can be used as an incentive or sanction tool by the VHU with the exception of approved religious or educational programming.

Phase I offenders may not have a personal television in their cell; they may enroll in the distance learning program provided by the Division of Education; may not participate in group religious services but may practice their beliefs privately and may possess authorized individual faith items; are allowed one two-hour non-contact visit weekly; are housed in single cells; must complete programming such as the "Challenge Series;" receive two hours of inside pod recreation daily and one hour, five times per week, in outside exercise modules; receive their meals in the pod and return to their cells to consume the meals; have a commissary spend limit of $10 per week; are not eligible to participate in the Securepak program; are eligible for job assignments subject to job availability; and must spend a minimum of six months in Phase I before becoming eligible for Phase II.

Phase II offenders have the same privileges as Phase I offenders, plus they may participate in group religious services; are assigned to a double cell; have a commissary spend limit of $50 per week; may participate in the Securepak program; have a total of five-and-a-

half hours out of cell activity, one hour of outside recreation daily, and access to gym recreation based on availability; and are eligible for in-pod job assignments.

Washington claims that OP 864.1 should be modified because it violates his rights under RLUIPA and the Free Exercise Clause of the First Amendment because it punishes him for practicing his religion and does not allow him to attend religious services with the general population. He also claims the policy violates the Equal Protection Clause because women are allowed to grow their hair longer than men and wear ponytails and braids and also because the prohibition of dreadlocks and braids for men targets black men in particular. Finally, he argues that OP 864.1 violates the Virginia Constitution and Virginia statutory law which prohibit the Commonwealth from interfering with a citizen's religious practices.

### (3) RLUIPA and the First Amendment

As an initial matter, it is important to note that Washington currently is allowed to grow his hair in dreadlocks and has been able to do so at least since he entered the VHU at WRSP in April 2016.[6] His claims under RLUIPA and the First Amendment are based on the fact that placement in the VHU keeps him isolated from the general population and results in some fewer privileges, such as not being able to attend worship services with the general population and not being allowed to work some jobs or attend trade school.

When performing a RLUIPA analysis, the court first must determine whether the prison policy creates a substantial burden on the exercise of an inmate's religion. Although Washington is allowed to grow dreadlocks, his refusal to cut his hair has caused him to be

---

[6] While Washington continues to complain about his hair being forcefully cut while he was at another facility, that claim has been dismissed.

placed in the VHU where he has fewer privileges than inmates in the general population and where the stated objective is to "manage and encourage compliance" with grooming regulations. In Couch v. Jabe, 679 F.3d 197, 200-201 (4th Cir. 2012) (citing Warsoldier v. Woodford, 418 F.3d 989, 996 (9th Cir. 2005)), the Fourth Circuit found that an inmate who refused to shave for religious reasons and was placed in a more restrictive program "to guide the offender to more appropriate behaviors" made the requisite showing that his practice of religion was substantially burdened. See also McRae v. Johnson, 261 Fed. Appx. 554, 556 (4th Cir. 2008) (affirming district court's conclusion that VDOC grooming policy substantially burdened Rastafarian's religious exercise) and Maxwell v. Clarke, No. 7:12cv00477, 2013 WL 2902833 at *6 (W.D. Va. 2013) (assuming for purposes of summary judgment motion that grooming policy which confined inmate to segregation without permission to attend religious services for his refusal to cut his hair substantially burdened his religious beliefs). But see Olds v. Clarke, No. 7:16cv00345, 2017 WL 4294212 at * 4 (W.D. Va. 2017) (finding that Rastafarian inmate placed in VHU did not demonstrate a substantial burden on his religious exercise).

Given that the stated goal of OP 864.1 is "to manage and encourage compliance" with grooming standards and that VHU offenders receive fewer privileges than other inmates and cannot transfer to a lower security level facility, the court finds that placement in VHU substantially burdens Washington's exercise of his religion. Having made such a finding, the burden shifts to defendants to show that the policy furthers a compelling state interest by the least restrictive means. 42 U.S.C. § 2000cc-2 (b); Incumaa v. Stirling, 791 F.3d 517, 525 (4th Cir. 2015).

Defendants submitted affidavits from A. David Robinson, the Chief of Corrections Operations at VDOC, and J. Collins, the Unit Manager of the VHU at WRSP. Robinson stated that the grooming standards were established to facilitate identification of offenders and promote safety, security, and sanitation. Contraband can be hidden in long hair and Robinson described several examples of sharpened instruments, illegal substances, and a homemade handcuff key being concealed in long hair and beards. Robinson described other examples of long hair concealing health issues such as tumors and sores, lice and spider infestations, scabies, assorted cysts, rashes, skin disease, fungal infections, boils, dandruff, and acne. Also, inmates have escaped and attempted to escape by shaving off long hair and beards to change their appearance. Robinson Aff., ECF No. 84-3 at 2-5.

Collins stated that VHU offenders are in the general population, but are not housed near other general population offenders and are not allowed to participate in all the programming and religious services offered to the general population. The segregation prevents the exchange of contraband between offenders and facilitates the identification of offenders by security staff. Collins Aff., ECF No. 84-1 at 2-4.

In McRae, the Fourth Circuit found that "in the prison setting, suppression of contraband, maintaining discipline and security among the inmate population, maintaining the health and safety of inmates and staff, and preventing prisoners from quickly changing their appearance constitute compelling government interests." McRae, 261 Fed. Appx. at 558. See also Ragland v. Angelone, 420 F.Supp.2d 507, 515 (W.D. Va. 2006) (finding defendants offered substantial evidence that VDOC grooming policy furthered compelling penological interests in security, staff safety, inmate identification, and inmate health). This court similarly

21

finds that the VDOC grooming policy furthers a compelling state interest in maintaining security at the facilities, protecting inmate and staff health and safety, and facilitating quick and accurate identification of inmates.

This court also finds that placement in the VHU is the least restrictive means for VDOC to accomplish its safety, security, and health goals. Washington may wear his hair in accordance with his religious beliefs and he is accorded almost all the privileges given to inmates in the general population. His activities are restricted only to the extent that he cannot be around non-VHU inmates, which, as discussed above, would increase opportunities for the sharing of contraband and also increase the possibility of passing on diseases and parasites.

Washington argues that placement in the VHU is not the least restrictive means of accommodating his religious exercise. Rather, he suggests that a transfer to the federal Bureau of Prisons (BOP), which does not restrict offender hair length, would be the least restrictive means of accommodating his religious exercise. Pursuant to 18 U.S.C. § 5003, the BOP may contract with state officials for the custody, care, subsistence, education, treatment, and training of persons convicted in state courts. Any such contract must provide for reimbursing the United States for all costs involved; for receiving in exchange persons convicted in federal court who will serve their sentences in state prison as provided in 18 U.S.C. § 4082(b); or for compensating the United States by a combination of monetary payment and inmate exchange.

Even if transferring Washington to the BOP were less restrictive than placement in the VHU, this court is without authority to order such relief. The authority to enter into a contract for such a transfer lies with the director of the BOP and neither the BOP nor its director is a party to this lawsuit. Washington may request such a transfer, but he cited no authority and

22

none was found that would allow this court to order OP 864.1 to be modified to offer inmates a transfer to the BOP.

In sum, the court finds that OP 864.1 does not violate Washington's religious exercise rights under either RLUIPA or the more stringent requirements of the First Amendment. Although placement in the VHU does create a substantial burden on Washington's right to exercise his religion, the government has created the policy in accordance with compelling government interests and placement in the VHU is the least restrictive means of furthering those interests.

### (4) Equal Protection

Washington also claims that OP 864.1 as it is written violates the equal protection clause because women are allowed to wear their hair longer than men even though a woman could conceal contraband in her hair as easily as could a man. Claims of gender discrimination in prison regulations are analyzed using the intermediate scrutiny standard. Ashann-Ra v. Com. of Va., 112 F.Supp.2d 559, 570-571 (W.D. Va. 2000).

Washington fails to make out a claim for an equal protection violation. While women are allowed to wear shoulder-length hair in one or two ponytails or multiple neat, tight braids, neither men nor women are allowed to wear dreadlocks or any style that can conceal contraband. Additionally, while there may be merit to Washington's argument that women could just as easily hide contraband in a ponytail or braid as could a man, defendants submitted affidavit testimony that men are more inclined to present security risks than women and that although women fight, they rarely do so with weapons. Washington submitted no evidence to challenge the testimony and such evidence has been found sufficient to overcome an equal

23

protection gender challenge to prison hair-length policy. See DeBlasio v. Johnson, 128 F.Supp.2d 315, 327 (E.D. Va. 2000); Ashann-Ra, 112 F.Supp.2d at 571-572; and Motto v. Rider, No.5:07-cv-00627, 2008 WL 4224814 (S.D.W.V. 2008).

Washington also argues that prohibition of braids, plaits, dreadlocks, and cornrows discriminates against black men because such hairstyles are part of African culture and have been worn by black men for centuries. It is noted that the prohibition of these hairstyles applies to all inmates and not just black inmates. Nevertheless, to the extent that Washington is arguing that the rule has a disparate impact on black prisoners, the race-based claim is subject to review under the strict scrutiny standard. Johnson v. California, 543 U.S. 499, 505 (2005). As such, the government must show that racial classifications are narrowly tailored measures that further a compelling government interest.

Defendants have made that showing in this case. The prohibition on braids, plaits, dreadlocks, and cornrows for male prisoners is a narrowly tailored measure to reduce concealment of contraband and health problems and provide for security in the institution. Accordingly, Washington cannot show that the prohibition violates his rights under the Equal Protection Clause.

The court finds that OP 864.1 does not violate the Equal Protection Clause of the Constitution. Washington's arguments to the contrary are without merit and provide no basis for the court to order injunctive relief to modify the policy. Nor, as discussed above, has Washington shown that OP 864.1 violates his right to religious freedom under either the RLUIPA or the First Amendment. Therefore, his request for injunctive relief modifying the policy is **DENIED**.

24

### (5) Virginia Constitution

To the extent Washington asserts that OP 864.1 violates the Virginia Constitution, this court declines to exercise supplemental jurisdiction over his claim and it is dismissed without prejudice pursuant to 28 U.S.C. § 1367(c).

### C. Restoration of Fundamental Privileges

Washington was in Phase I of the VHU when he filed this lawsuit. At that time, he complained of the lack of privileges given Phase I inmates as opposed to Phase II inmates, e.g., not being allowed to participate in the Securepak program and not having the same amount of recreation time. He also complained about the lack of privileges accorded all inmates in the VHU, such as not being allowed contact visits and not being allowed to attend religious services with the general population. He asked that defendants Fleming, Combs, J. Collins, Anderson, and King be ordered to restore his "fundamental privileges."

Since that time, Washington has transitioned to Phase II of the VHU and has stated that "he can receive all his fundamental privileges." ECF No. 88 at 9. Accordingly, his request to have the state defendants restore his fundamental privileges has become moot and is **DISMISSED**. To the extent he is asking that Phase II offenders be allowed to have all the privileges of inmates who are not housed in the VHU, the court finds that the restrictions comply with constitutional requirements for offenders and the court will not order that they be modified.

### CONCLUSION

As set forth above, the court **GRANTS** defendants' supplemental motion for summary judgment, ECF No. 83, and **DISMISSES** Washington's claims that the refusal to provide him

an egg substitute violates his constitutional and statutory rights. The court also **DISMISSES** Washington's claims for injunctive relief either because he has not shown that he is entitled to such relief or because his claims have become moot. Summary judgment is entered for all defendants in their individual and official capacities and all claims against them are **DISMISSED**.

The Clerk is directed to send copies of this memorandum opinion and accompanying order to Robinson and to counsel of record for defendants.

It is so **ORDERED**.

ENTERED: 03-26-2019

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge